## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **FELISHA GAIL WORLEY,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00035 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Felisha Gail Worley, ("Worley"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Worley protectively filed her applications for SSI and DIB on September 12, 2011, alleging disability as of July 21, 2011, due to depression, anxiety, agoraphobia, panic attacks and suicidal ideation. (Record, ("R."), at 190-99, 209, 232, 236, 264.) The claims were denied initially and upon reconsideration. (R. at 89-91, 101-04, 106-10, 112-17, 119-21.) Worley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 122-23.) A hearing was held by video conferencing on April 15, 2013, at which Worley was represented by counsel. (R. at 22-40.)

By decision dated April 29, 2013, the ALJ denied Worley's claims. (R. at 10-21.) The ALJ found that Worley met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 12.) He found that Worley had not engaged in substantial gainful activity since July 21, 2011, the alleged onset date. (R. at 12.) The ALJ found that the medical evidence established that Worley had severe impairments, namely anxiety, depression and panic attacks, but he found that Worley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-13.) The ALJ found that Worley had the residual functional capacity to perform a full range of work at all exertional levels requiring no more than one- to two-step job instructions and no more than occasional interaction with the general public. (R. at 14.) The ALJ found that Worley was able to perform her past relevant work as a clean-up worker. (R. at 19.) Based on Worley's age, education, work history and residual functional

capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Worley could perform, including jobs as a night cleaner, an assembler and a mail routing clerk. (R. at 19-20.) Thus, the ALJ concluded that Worley was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2015).

After the ALJ issued his decision, Worley pursued her administrative appeals, (R. at 6), but the Appeals Council denied her request for review. (R. at 1-4.) Worley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Worley's motion for summary judgment filed May 11, 2015, and the Commissioner's motion for summary judgment filed June 15, 2015.

## II. Facts

Worley was born in 1984, (R. at 190, 192), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education, and she obtained a certificate in phlebotomy. (R. at 25, 210.) She has past work experience as a bank teller, a customer service representative, a cashier, a cook and a buser. (R. at 26.) Worley stated that she was unable to work because she could not function well around crowds and other people. (R. at 27.) She stated that she received therapy and counseling, as well as medication, and that they "are very helpful." (R. at 28.) Worley stated that she did not experience any side effects from her medications. (R. at 29.) She stated that she attempted to harm

herself by cutting her wrists; however, she did not seek medical attention other than calling her counselor. (R. at 30.)

Asheley Wells, a vocational expert, also was present and testified at Worley's hearing. (R. at 35-38.) Wells classified Worley's past work as a bank teller as light[1] and skilled; as a telephone representative as sedentary[2] and semi-skilled; as a cashier as light and unskilled; as a clean-up worker as medium[3] and semi-skilled; and as a fast food worker as light and unskilled. (R. at 37.) Wells was first asked to consider a hypothetical individual of Worley's age, education and work history who would have no exertional limitations and who would require only one- to two-step job instructions and no more than occasional interaction with the general public. (R. at 37.) Wells testified that such an individual could perform Worley's past work as a clean-up worker, as well as other jobs existing in significant numbers in the national economy, including those of a night cleaner, an assembler and a mail routing clerk. (R. at 37-38.)  Wells next testified that a hypothetical individual who had no useful ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2015).

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

concentration; to relate predictably in social situations; to understand, remember and carry out simple job instructions; and to demonstrate reliability and who would be absent from work more than two days per month could not perform any work. (R. at 38.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Jo McClain, P.C., a state agency professional counselor; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Paula Nuckols, M.D., a state agency physician; Eric Oritt, Ph.D., a state agency psychologist; Norton Community Hospital; Medical Associates of Big Stone Gap; Dr. Maurice Nida, D.O.; Lonesome Pine Hospital; Medical Associates of Southwest Virginia; Dr. Eric D. Moffet, M.D., a psychiatrist; D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker; PD1/Frontier Health; Wellmont Bristol Regional Medical Center; and Robert S. Spangler, Ed.D., a licensed psychologist.

Records from Wise County Public Schools indicate that on January 23, 1997, Worley was evaluated for problems of poor grades, problems at school and failing grades. (R. at 295-96.) Worley cried during the initial interview and showed signs of depression. (R. at 295.) She was diagnosed with academic problems and encopresis[4] without constipation and overflow incontinence.[5] (R. at 296.) On January 27, 1997, a psychological evaluation was conducted to determine if Worley needed to be placed in special education classes. (R. at 290-94.) The Wechsler Intelligence Scale for Children - Third Edition, ("WISC-III"), was

---

[4] Encopresis is defined as the repeated uncontrolled or involuntary passage of feces not as the result of a physical disorder, but for psychological reasons. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 264 (1995).

[5] There is no indication in the record that this condition persisted.

administered, and Worley obtained a performance IQ score of 91±5, a verbal IQ score of 91±3 and a full-scale IQ score of 90±3. (R. at 287, 291.) It was determined that Worley's learning styles were balanced, and there were no signs of organicity, cultural adversity or inherent attention deficits. (R. at 293.) Her cognitive skills were scattered, suggesting that lapses in attention and motivation were likely factors that influenced how she learned and performed. (R. at 293-94.)

The record shows that Dr. Maurice Nida, D.O., treated Worley for migraine headaches since 2002. (R. at 401-402, 405-06, 410-16.) During this time, it was noted that Worley's migraines were stable and controlled with medication. (R. at 401-02, 405, 411-12, 414.) On August 30, 2007, Worley complained of bilateral hip pain following a motor vehicle accident that occurred the previous year. (R. at 395.) No significant limited range of motion was noted. (R. at 395.) An x-ray of Worley's right hip was normal, with the exception of metallic clips over the first sacral segment on the right side. (R. at 313.) On February 15, 2010, Worley complained of migraine headaches and inquired as to weight loss therapy. (R. at 392.) She weighed 238 pounds. (R. at 392.) Examination was negative, and Worley's extremities showed no weakness, clubbing, cyanosis or edema with normal pulses. (R. at 392.) Dr. Nida diagnosed migraines and weight gain. (R. at 393.)

On July 7, 2011, Worley reported that medication helped with her migraine headaches. (R. at 383.) Worley reported feelings of lightheadedness and pallor resulting from iron deficiency anemia; however, she stated that she discontinued her iron supplements due to stomach upset. (R. at 383.) She complained of left wrist and elbow pain resulting from carpel tunnel syndrome. (R. at 383.) Worley was 5 feet, 8 inches tall and weighed 249 pounds. (R. at 384.) Worley stated that

Tylenol relieved her headaches. (R. at 384.) While Worley stated that her vision was getting "blurry," her visual examination was normal. (R. at 384.) Dr. Nida reported that Worley's physical examination was normal. (R. at 384-86.) Her affect was appropriate; her cranial nerves were grossly intact; she had normal motor strength; and she had a normal gait and reflexes. (R. at 385.) On July 20, 2011, Worley's examination was normal. (R. at 331-32.) Dr. Sam G. Vorkpor, M.D., diagnosed depression with anxiety; and anxiety with an acute reaction to gross stress. (R. at 332.) On July 27, 2011, Worley complained of depression. (R. at 381.) Dr. Nida reported that Worley was oriented; her mood and affect were described as anxious, apathetic, depressed and sad; and her insight was appropriate. (R. at 381.) Dr. Nida diagnosed depression with anxiety; and conversion disorder. (R. at 382.) Dr. Nida excused Worley from work for two weeks. (R. at 382.)

On August 11, 2011, Worley reported feeling well with only minor complaints. (R. at 328.) She stated that medication helped with her migraine headaches. (R. at 328.) Worley reported feelings of lightheadedness and pallor, resulting from iron deficiency anemia, and left wrist and elbow pain, resulting from carpel tunnel syndrome. (R. at 328.) Worley reported that her arm shaking, which Dr. Nida referred to as similar to as a conversion disorder, had improved since stopping Cymbalta. (R. at 328.) Examination was normal. (R. at 329-30.) Dr. Nida diagnosed agoraphobia with panic attacks; depression with anxiety; and migraines. (R. at 330.) On September 12, 2011, Worley reported that her migraine headaches and depression were improving with medication. (R. at 325.) Worley continued to complain of phobia while in crowds, driving and at major event functions. (R. at 325.) Examination was normal. (R. at 326-27.) Dr. Nida stated

that it was doubtful that Worley would be able to work in an environment with people, and he suggested that Worley apply for disability benefits. (R. at 327.)

On December 8, 2011, Dr. Nida completed a medical assessment, indicating that Worley had the ability to lift and carry objects "very little" due to carpal tunnel syndrome and obesity. (R. at 568-70.) Worley's abilities to stand, to walk and to sit were not affected. (R. at 568-69.) Dr. Nida opined that Worley could occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 569.) He found that Worley's abilities to reach, to handle, to feel and to push and pull were affected by her impairments, which he attributed to carpal tunnel syndrome that caused her to lose her grip and to experience pain. (R. at 569.) Dr. Nida found that Worley had no environmental restrictions. (R. at 570.) He opined that Worley would be absent from work more than two days a month. (R. at 570.)

On January 19, 2012, Worley reported that her symptoms of depression and migraine headaches were improving with medication. (R. at 485.) Dr. Nida noted that Worley had carpel tunnel syndrome in both wrists. (R. at 485.) Worley weighed 256 pounds. (R. at 486.) Physical examination was normal, with the exception of tenderness in Worley's wrist. (R. at 486-87.) On January 7, 2013, Worley reported worsening symptoms of depression because her husband asked for a divorce. (R. at 526.) Physical examination was normal. (R. at 527.) Dr. Nida reported that Worley was unable to work and support herself due to panic disorder with agoraphobia. (R. at 527.)

On January 8, 2013, Dr. Nida completed a mental assessment, indicating that Worley had an unlimited ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 530-

32.) He opined that Worley had a limited, but satisfactory, ability to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; and to demonstrate reliability. (R. at 530-31.) Dr. Nida opined that Worley had a seriously limited ability to relate to co-workers and to behave in an emotionally stable manner. (R. at 530-31.) He found that Worley had no useful ability to deal with the public; to deal with work stresses; and to relate predictably in social situations. (R. at 530-31.) He found that Worley would be absent from work more than two days a month. (R. at 532.)

On April 2, 2013, Dr. Nida completed a mental assessment, indicating that Worley had a limited, but satisfactory, ability to follow work rules; to understand, remember and carry out complex, detailed and simple job instructions; and to maintain personal appearance. (R. at 573-75.) He opined that Worley had a seriously limited ability to function independently; to maintain attention and concentration; and to demonstrate reliability. (R. at 573-74.) He found that Worley had no useful ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 573-74.) He found that Worley would be absent from work more than two days a month. (R. at 575.)

On February 17, 2010, Worley was seen at the emergency room at Lonesome Pine Hospital for complaints of migraine headaches. (R. at 360.) On July 26, 2011, Worley was seen at the emergency room for complaints of stuttering and left arm tremor. (R. at 344-46, 349-51.) She was diagnosed with an adverse reaction to medication and was advised to discontinue Cymbalta. (R. at 346.) On

August 28, 2012, Worley was seen at the emergency room for sinus congestion and upper respiratory symptoms. (R. at 512-16.) She weighed 278 pounds. (R. at 513.) Physical examination was normal, with the exception of sinusitis. (R. at 514-15.) She had normal strength and tone, full range of motion in all extremities, good coordination and normal gait. (R. at 515.)

On October 31, 2011, Jo McClain, a state agency professional counselor, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Worley suffered from an affective disorder and anxiety-related disorders. (R. at 44-45.) She found that Worley had mild limitations on her ability to perform her activities of daily living and moderate difficulties in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 44.) She opined that Worley had not experienced any episodes of decompensation of extended duration. (R. at 44.)

That same day, McClain completed a mental assessment, indicating that Worley had no significant limitations in her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions. (R. at 46-47.) She opined that Worley was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 46-47.) McClain opined that Worley was markedly limited in her ability to interact appropriately with the general public. (R. at 46-47.) McClain stated that Worley retained the ability to perform simple work, with modest social demands, that would allow her to avoid working with crowds of people. (R. at 47.)

On November 1, 2011, Dr. Richard Surrusco, M.D., a state agency physician, reported that Worley had a history of anxiety, panic attacks and depression. (R. at 60.) He found that Worley's condition did not affect her ability to understand, remember or perform most normal daily activities. (R. at 60.) He opined that Worley could perform simple, routine work that did not require a great deal of contact with other people. (R. at 60.) Dr. Surrusco found that the evidence did not show other conditions that would significantly limit Worley's ability to work. (R. at 60.)

By letter dated October 26, 2011, Dr. Eric D. Moffet, M.D., a psychiatrist, diagnosed Worley with major depression, panic disorder and anxiety disorder. (R. at 446.) He assessed her then-current Global Assessment of Functioning, ("GAF"),[6] score at 50.[7] (R. at 446.) On November 28, 2011, Dr. Moffet completed

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

a mental assessment, indicating that Worley had a limited, but satisfactory, ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 422-24.) He opined that Worley had a seriously limited ability to interact with supervisors; to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 422-23.) In November 2011, December 2011, and throughout 2012, Dr. Moffet reported that Worley's mental status evaluation revealed that she had normal appearance; appropriate affect; euthymic mood; intact sensorium and memory; unremarkable thought content; linear thought process; and normal judgment. (R. at 426-27, 442-43, 475, 533-45.) During this time he assessed Worley's GAF score at 50. (R. at 426-27, 429, 442-43, 475, 533-45.)

On March 19, 2012, Dr. Moffet completed a mental assessment, indicating that Worley had a limited, but satisfactory, ability to use judgment, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 490-92.) He opined that Worley had a seriously limited ability to follow work rules; to deal with the public; to function independently; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 490-91.) Dr. Moffet found that Worley had no useful ability to relate to co-workers; to interact with supervisors; to deal with work stresses; to maintain attention and

_____

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

concentration; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 490-91.) He opined that Worley would be absent from work more than two days monthly due to her impairments. (R. at 492.)

On February 7, 2013, Dr. Moffet completed a mental assessment, indicating that Worley had a limited, but satisfactory, ability to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 564-66.) He opined that Worley had a seriously limited ability to deal with the public; to use judgment; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; and to behave in an emotionally stable manner. (R. at 564-65.) Dr. Moffet found that Worley had no useful ability to follow work rules; to relate to co-workers; to interact with supervisors; to deal with work stresses; to understand, remember and carry out complex job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 564-65.) He opined that Worley would be absent from work more than two days monthly due to her impairments. (R. at 566.)

The record shows that Worley saw D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker, from October 2011 through February 2013. (R. at 435, 460-62, 547-62.) On October 27, 2011, Worley complained of feeling very sad, anxious and paranoid. (R. at 460.) She also reported panic attacks. (R. at 460.) Weitzman diagnosed social anxiety disorder; panic disorder with agoraphobia; post-traumatic stress disorder, ("PTSD"); generalized anxiety disorder; and bereavement. (R. at 460.) She assessed Worley's then-current GAF score at 40.[8] (R. at 460.) On

---

[8] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

November 17, 2011, Weitzman noted that Worley's symptoms were improving with medication. (R. at 562.) On December 14, 2011, Worley complained of anger episodes. (R. at 435, 461.) Mental status examination revealed that she was casually dressed and clean with a depressed mood and anxious affect; intact orientation; racing thought process; transient paranoia and delusions; and fair judgment and insight. (R. at 435, 461.) She noted that Worley had mildly improved since seeing Dr. Moffett. (R. at 435, 461.) Weitzman diagnosed bipolar disorder; PTSD; panic disorder with agoraphobia; and obsessive compulsive disorder. (R. at 435, 461.)

On December 19, 2011, Weitzman completed a mental assessment, indicating that Worley had a seriously limited ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 470-72.) She opined that Worley had no useful ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 470-71.) Weitzman reported that Worley would be absent from work more than two days a month. (R. at 472.)

On March 22, 2012, Worley reported that her symptoms were improving with medication. (R. at 560.) On April 5, 2012, Worley reported that she had been walking, losing weight and was feeling better. (R. at 559.) On July 10, 2012, Worley reported that she was exhausted all of the time and that she was tired of being a wife, a mother and a family member. (R. at 556.) On August 2, 2012, Worley reported that she was doing better, she had more energy and that "things

[were] going good." (R. at 554.) On October 4, 2012, Worley reported that she was sad, agitated, hostile and very depressed. (R. at 550.) Weitzman noted that Worley was decompensating slowly with mood swings and increased agitation. (R. at 550.) On February 16, 2013, Worley reported that her husband had asked her for a divorce. (R. at 547.) Weitzman reported that Worley's mood was depressed; she had an anxious affect; she had intact orientation; she had racing thought process; transient paranoia and delusions; and fair insight and judgment. (R. at 547.) Weitzman diagnosed bipolar I disorder, most recent episode depressed, severe; PTSD; social anxiety disorder; panic disorder with agoraphobia; generalized anxiety disorder; and partner relational problems. (R. at 547.)

On February 23, 2012, Weitzman completed a mental assessment, indicating that Worley had a seriously limited ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 480-82.) She opined that Worley had no useful ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 480-81.) Weitzman reported that Worley would be absent from work more than two days a month. (R. at 482.)

On April 10, 2013, Weitzman completed a mental assessment, indicating that Worley had a seriously limited ability to maintain personal appearance. (R. at 577-79.) She opined that Worley had no useful ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with

supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex, detailed and simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability (R. at 577-78.) She found that Worley would be absent from work more than two days a month. (R. at 579.)

On February 18, 2012, Worley was admitted to Wellmont Bristol Regional Medical Center on a temporary detention order. (R. at 504-10.) On admission, Worley reported that she felt like she had a rock on her chest, that she was seeing a penguin on her chest and feeling confused. (R. at 504.) She was examined by internal medicine, and no acute medical concerns were reported. (R. at 504.) With minor adjustments in Worley's medications, her psychiatric symptoms resolved. (R. at 504.) Upon discharge, Worley was cooperative with appropriate behavior; her speech and psychomotor activity were within normal limits; her thoughts were coherent and goal-directed; her mood was good; her affect was congruent; and her insight and judgment were intact. (R. at 504.) Worley's discharge diagnoses were major depression, severe, recurrent with psychotic features; psychosis, resolved; anxiety disorder, not otherwise specified; and a need to rule out bipolar disorder. (R. at 504.) Her then-current GAF score was assessed at 50 to 60.[9] (R. at 504.)

On June 9, 2012, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Worley at the request of Worley's attorney. (R. at 494-500.) Spangler noted that Worley was clean and appropriately dressed; she had awkward gross motor movements, secondary to obesity; she had age-appropriate fine motor skills;

---

[9] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

she was socially confident, but anxious and depressed; she demonstrated good concentration, on prescription medications; she was appropriately persistent on tasks; she had adequate recall of remote and recent events; her motor activity was tense; her mood was depressed/anxious with a congruent affect; her judgment and insight were consistent with average intelligence; her stream of thought was unremarkable; associations were logical; her thought content was nonpsychotic; and she displayed adequate social skills. (R. at 494-96.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Worley obtained a full-scale IQ score of 90. (R. at 497.) Spangler diagnosed major depressive disorder, recurrent, moderate to severe on medications; and panic disorder without agoraphobia, moderate to severe on medications. (R. at 497.) He assessed Worley's then-current GAF score at 50 to 55. (R. at 497.)

Spangler completed a mental assessment, indicating that Worley had a limited, but satisfactory, ability to use judgment; to maintain attention and concentration, on medications; and to maintain personal appearance. (R. at 498-500.) He opined that Worley had a seriously limited ability to follow work rules; to deal with the public; to interact with supervisors; to function independently; to understand, remember and carry out detailed and simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 498-99.) Spangler opined that Worley had no useful ability to relate to co-workers; to deal with work stresses; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 498-99.) He found that Worley would be absent from work more than three days a month. (R. at 500.)

On January 19, 2012, Dr. Paula Nuckols, M.D., a state agency physician, found that Worley's physical diagnoses of migraines, Vitamin D deficiency,

obesity, carpel tunnel syndrome and iron deficiency anemia did not cause severe limitations. (R. at 67.)

On January 18, 2012, Eric Oritt, Ph.D., a state agency psychologist, completed a PRTF, indicating that Worley suffered from an affective disorder and anxiety-related disorders. (R. at 68.) He found that Worley had mild limitations on her ability to perform her activities of daily living and moderate difficulties in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 68.) He opined that Worley had not experienced any episodes of decompensation of extended duration. (R. at 68.)

That same day, Oritt completed a mental assessment, indicating that Worley had no significant limitations in her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions. (R. at 69-71.) He opined that Worley was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral

extremes; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 70-71.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Worley argues that the ALJ erred by failing to find that she suffered from a severe exertional impairment. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7). Worley also argues that the ALJ erred by improperly determining her residual functional capacity (Plaintiff's Brief at 7-9.)

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2015). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2015). The Fourth Circuit held in *Evans v. Heckler,* that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)) (emphasis in original).

The ALJ found that Worley had the residual functional capacity to perform a full range of work at all exertional levels requiring no more than one- to two-step job instructions and no more than occasional interaction with the general public. (R. at 14.) Based on my review of the record, I do not find that substantial evidence exists to support either the ALJ's finding that Worley did not suffer from a severe physical impairment or with regard to her residual functional capacity.

The ALJ specifically found that Worley did not have a severe physical impairment. (R. at 12-13.) He also found that Worley had the ability to perform work at all exertional levels. (R. at 14.) At another point, however, the ALJ noted that "the evidence shows that the claimant has physical and psychiatric limitations in her ability to perform work-related activities, but that she remains able to

perform work at the light level of exertion." (R. at 18.) The record shows that Dr. Nida opined that Worley could occasionally lift and carry objects weighing "very little" due to her diagnoses of carpel tunnel syndrome and obesity. (R. at 568.) Dr. Nida further found that Worley's ability to reach, to handle, to feel, to push and to pull was limited due to carpel tunnel symptoms. (R. at 569.) Worley was consistently diagnosed with obesity, being 5 feet, 8 inches tall and weighing between 235 and 278 pounds. (R. at 325-26, 328-29, 331, 381, 383-84, 391, 418, 420, 485-87, 513, 526-27.) While the ALJ noted that Dr. Nida's medical source statement, indicating that Worley had the residual functional capacity to perform less than sedentary work due to carpal tunnel syndrome and chest pain, he failed to address Dr. Nida's finding that obesity limited Worley's abilities. (R. at 568-70.) In addition, Spangler noted that Worley had awkward gross motor movements, secondary to obesity. (R. at 494.) Regardless of the evidence showing that Worley suffered from physical impairments impacting her work-related abilities, the inconsistency in the ALJ's opinion regarding the effects of her physical impairments would justify remand.

Furthermore, the ALJ found that Worley would be limited to no more than one- to two-step job instructions and no more than occasional interaction with the general public. (R. at 14.) The ALJ noted that he was giving "great weight" to the opinion of state agency psychologist, Dr. Oritt, and "some weight" to Spangler's opinion. (R. at 18.) These mental health providers, however, placed many more restrictions on Worley's work-related mental abilities as did every other mental health provider who provided an opinion as to Worley's mental residual functional capacity. Dr. Oritt found that Worley also was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 70-71.)

Spangler opined that Worley had a seriously limited ability to follow work rules; to deal with the public; to interact with supervisors; to function independently; to understand, remember and carry out detailed and simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 498-99.) Spangler opined that Worley had no useful ability to relate to co-workers; to deal with work stresses; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 498-99.)

These opinions are consistent with the assessments of state agency professional counselor McClain, Dr. Moffet and Weitzman, who opined that Worley either was moderately limited or had no ability to work in coordination with others, to get along with co-workers, to interact with supervisors and to deal with work stresses. (R. at 44, 46-47, 470-71, 490, 564, 577.) Furthermore, state agency physician, Dr. Surrusco, opined that Worley would need a job that did not require a great deal of contact with other people. (R. at 60.) Based on this, I do not

find that substantial evidence supports the ALJ's finding with regard to Worley's residual functional capacity.

Based on the above reasoning, I conclude that substantial evidence does not support the ALJ's weighing of the evidence, and I further find that substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:     March 30, 2016.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE